**IN THE COURT OF APPEALS OF IOWA**

No. 23-1857
Filed January 10, 2024

**IN THE INTEREST OF L.H.,**
**Minor Child,**

**L.H., Minor Child,**
    Appellant.
_____

Appeal from the Iowa District Court for Boone County, Ashley M. Beisch, District Associate Judge.

In child-in-need-of-assistance proceedings, the seventeen-year-old child appeals the permanency ruling giving the mother an additional six months to work toward reunification; the child asks that termination proceedings be initiated immediately. **REVERSED AND REMANDED WITH DIRECTIONS.**

Brian T. Bappe of Bappe Law Office, Nevada, attorney for appellant minor child.

Mark Olberding of Olberding Law Office, Nevada, guardian ad litem for appellant minor child.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Katherine Flickinger of Hastings & Gartin Law Group LLP, Ames, attorney for appellee mother.

Considered by Greer, P.J., and Ahlers and Buller, JJ.

**GREER, Presiding Judge.**

Seventeen-year-old L.H.—who turns eighteen in June 2024—appeals the juvenile court's permanency ruling giving her mother an additional six months to work toward reunification. *See* Iowa Code § 232.104(2)(b) (2023). L.H. asks that we reverse the award of additional time and order that termination-of-parental-rights proceedings be started immediately.[1] The mother maintains that more time was appropriate because reunification was likely within six months and argues the additional time was necessary for the Iowa Department of Health and Human Services to make reasonable efforts to reunify her with the child.[2]

**I. Background Facts and Proceedings.**

In October 2022, it was alleged that the mother was showing behavioral indicators of methamphetamine use. And the sheriff's office was dispatched to the family home after it was reported a gun had gone off and hit a neighbor's home. When the police arrived, one of the mother's minor children was intoxicated. Two other children were also present in the home, with spent .22 casings on the floor. Police found the mother hiding in the attic; she claimed to be unaware of what was happening below. Because of an outstanding warrant for violating her probation, the mother was arrested. And a child-in-need-of-assistance (CINA) petition was

---

[1] The mother is also the parent of an adult child who was never part of the juvenile court proceedings; D.H., born in 2007; and T.H., born in 2014. L.H. is the only child at issue in this appeal.

[2] At the permanency hearing, the department recommended that termination proceedings be started. Though the juvenile court decided on a different course of action, because the State did not file a notice of appeal, it cannot—as it recognizes in a statement filed with the court—challenge the adverse ruling. *See In re J.L.*, 973 N.W.2d 895, 899 n.1 (Iowa Ct. App. 2022).

filed concerning all three of the mother's children under the age of eighteen: L.H., D.H., and T.H.

The mother was required to serve four days in jail following her arrest; all three children were temporarily removed from the mother's custody. L.H. was placed in foster care, while T.H. went to stay with her father and D.H. went into shelter care.

The mother submitted to hair drug testing after her release from jail; the results were positive for THC metabolite and methamphetamine.

Before the November CINA hearing, the guardian ad litem (GAL) reported to the court that while L.H. should have been in 9th or 10th grade, she had not attended school since the 6th grade. L.H. wanted to be in school, and the foster family enrolled her in 9th grade at the local school. Following the hearing, the juvenile court confirmed the removal of all three children from the mother's custody. The mother stipulated that the children were CINA pursuant to Iowa Code section 232.96(3)(b),[3] and the juvenile court found that the mother needed to address her substance abuse and mental health before she could regain custody of the children.

By February 2023, T.H. was in the custody of her father with the continued supervision of the department. D.H.—who snuck away from the shelter, stole alcohol, and drank until he was poisoned and needed medical intervention—

---

[3] A CINA adjudication under section 232.96A(3)(b) is appropriate when an unmarried child "has suffered or is imminently likely to suffer harmful effects as a result of . . . [t]he failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child."

remained in the department's custody and was placed in a qualified residential treatment program. L.H. remained with the same foster family.

The department's April update to the court reported that L.H. was attending school daily and, with hard work to catch up on the school she missed, was receiving good grades in her freshman classes. L.H. had talked about her wish not to return to her mother's care with both the foster family and her therapist; she expressed the desire to explore other alternatives. The report also noted ongoing concerns with the mother's substance abuse, stating the mother had:

> what appeared to be pick marks on her face and arms on 4/14/2023. She also had an absurd amount of energy. [She] was jumping off the couch to grab things off the wall and went from conversations about reunification to bull frogs in the basement within a few moments. She could not track the conversation or what was going on around her.

When asked, the mother reported her behavior was caused by her attention deficit hyperactivity disorder. Her drug patch in March was positive for THC—not methamphetamine—but there were questions if it had been tampered with. A January patch test was also positive for THC.

The GAL's May report noted that L.H. was doing well in school and with her foster family. L.H. had made friends, was regularly attending therapy, and enjoyed "doing normal 'teenager' things like going to prom." She mentioned that she wanted to get a job, attend driver's education, and get her license to drive.

Also in May, L.H. wrote a letter to the court. She said:

> I am writing this letter in hopes to be heard and considered. In a little over a year I will turn eighteen and be considered a legal adult. I have mixed emotions about that. I didn't have much of a childhood because of my mother[']s drug addiction, mental health issues and financial irresponsibility. We would move constantly and sometimes without any warning. I didn't attend school for almost five

years. Some of it was because of the constant moving and some because of [trauma] at home. I know my mother needs help and treatment and I want her to have that. I have asked her to get help befor[e]. I have asked her to put me in therapy and that all of us get family therapy. She said she would but then it would always fall through. She does good for [a ]while when she's being supervised then eventually falls back into her old behavior patterns. I have never had anything safe or constant in my life until now. The day I moved into my foster home with the [foster family]. They listen to me. They got me to a doctor and therapist right away. They also set up meetings with teachers and helped me have the courage to get back in school. . . . [M]y foster mom checks up on me and my grades. I have straight A's and I've made many friends here that I don't wanna leave. I got to go to prom this weekend with my foster siblings and had so much fun. I had never [known] what a healthy family looked like until now. I haven't harmed myself since I moved here. I'm finally safe. I do *not* want to move back with my mother. I love my mom but I just can't go back to that dysfunction. I'm worried about losing all the progress I've made in seven months. [The foster parents] are giving me structure and they encourage me to learn life skills. I need that to survive in the world. My mother doesn't have a job and can[']t drive. How will she take care of my needs? She also allows different men to stay at the house and I am not comfortable with that. When the worker asked about it she lied about it. I can't trust her words. I love my mom but I don't feel safe with her. My therapist has been helping me work through my [trauma]. I want my mom to work through her [trauma] so we can eventually have a healthy relationship. I don't want things to be like this for me or my siblings. I[']m worried about all of us. Thank you for listening to me[.]

The department's September update to the court—leading up to the permanency hearing being appealed—noted how well L.H. continued to do. She was up to date with her medical appointments, consistently attended therapy, and "finished the 2022-2023 school year advancing an entire grade ahead." L.H. was finding the next grade more challenging, so the foster parents were working with the school to find strategies that would help L.H. continue to succeed; L.H. attended school daily. Regarding the mother, the report stated:

[She] was asked to complete an updated substance abuse evaluation after having the positive drug tests and concerns for usage in April 2023. She did not complete the evaluation until

07/26/2023. During the evaluation they recommended scheduling a few more therapy sessions before they could make an appropriate recommendation. [The mother] has not been consistent with attending the substance abuse appointments with provider . . . through YSS. She has reported to remain sober and has been able to provide YSS with routine negative drug tests. She is getting a drug testing patch removed on 09/14/2023.

Additionally, the mother had been "extremely inconsistent" in attending her medication management, substance-abuse counseling, and mental-health therapy appointments since May. And she failed to complete her accountability letter to L.H. with her therapist. The letter was originally requested in April, and it was needed to begin family therapy with L.H. After several months without the letter, L.H. was no longer interested in attending family therapy with the mother. During the same period, the mother lost her home after the grandparents sold the property; she moved in with a friend. Due to a large amount owed to the utility company, it was unclear whether the mother would be able to rent a property in her own name. For all of these reasons, the department recommended changing the permanency goal to termination of parental rights. The GAL also recommended that termination proceedings be started.

After some continuances, the permanency hearing took place in late October. By that time, T.H. had been removed from her father's custody and was placed with the same foster family as L.H. D.H. was living with a separate foster family in a different town.

At the hearing, the State introduced evidence showing that while the mother had provided a number of urine drug tests for her substance-abuse counselor that were negative for all substances, the drug patch test referenced in the department's September report was positive for methamphetamine. When the

social worker asked the mother, she denied using methamphetamine and stated the test should have been positive for THC (which it was not). It was not clear that the mother had attended any substance-abuse counseling sessions since the positive test. The social worker testified that the same mental-health and substance-abuse concerns that existed when the CINA proceedings started still existed. Additionally, L.H. was not attending any visits with the mother and was not otherwise communicating with her. L.H. had voiced that she wanted to engage in family therapy with the mother before having any unsupervised time with her, and when that did not occur, L.H. stopped attending visits. She had not seen the mother in a few months.

The mother testified her sweat patch was positive for methamphetamine because she was spending time with people who were actively smoking methamphetamine in her presence—not from her own use. She explained she had three part-time jobs and had a plan to pay off her past due utilities so she could rent a home. The mother recognized the children could not be returned to her at the time but asked the court for an additional six months to work toward reunification.

L.H. chose to testify at the permanency hearing.[4] She testified she was in 11th grade and doing well; she recently obtained her first job and her driver's permit. L.H. described her relationship with her mother as "very inconsistent" and stated her preference that she not return to her mother's care. When asked, she expressed she was "in favor of having [the mother's] right to [her] terminated."

---

[4] L.H. testified in front of only the court, her attorney, the GAL, the State, and the mother's attorney.

In arguing for more time, the mother asserted:

> What the evidence tends to show for us is that [the mother] had, in fact, been improving up through July when there was discussion of actually increasing to overnight visits. However, at that point in time, due to no fault of her own, the home she was living in was sold and she became homeless.
>
> She found another safe place to stay that the department has evaluated. She has gained employment at three different employers, trying to pay off bills that she has so she can find long-term housing on her own, separate from the individual she's with.
>
> We will note that the department has shown that in August and September, there were some lapses in the therapy. [The mother] has explained why some of those lapses occurred. We'd also note that the only lapses in visits that have occurred that have been proven were through faults with [the department] failing to actually provide visits with the children. Other than that, [the mother] has actually attended every single visit that we've heard of today.
>
> She has indicated that she is communicating with her son once a week, and by his request now twice—every other day. When it comes to [T.H.], she has it set up to text every other day to see if [T.H.] is available and is making those communications with her, though she does respect [T.H.'s] boundaries when she wants a boundary.
>
> [The mother] has gotten a new [substance-abuse] evaluation even though she previously discharged. She indicated she is still seeing the YSS individual, Michael, who is making that recommendation for a more detailed recommendation.
>
> We would note that the evidence is that she has a good bond with both [D.H.] and with [T.H.], though certainly [L.H.] has stated her opinions and she is old enough to have an opinion on these matters.
>
> At this point in time, we are asking that rather than proceeding to termination, that the matter be extended out six months. We think the best justification for this is the fact that there had been progress being made up until a couple months ago.
>
> We understand that in these cases sometimes issues happen, relapses happen, timing becomes a problem. And that's kind of the issue here, is that the problem at which there was a relapse is not too long before this hearing, and that is not helpful for [the mother].
>
> However, she has indicated the steps she has set up for mental health, for substance abuse. It's indicated she has a good bond with the children. . . . They are of an age where it is not necessary that the Court find permanency within the one year, and the Court has discretion to extend, and we'd ask the Court to use that discretion. We think that it is in the best interest of the children that they have a chance to be moved back with their mother.

Sixteen-year-old D.H. did not participate in the hearing, but his attorney indicated D.H. was in agreement with the recommendation of the State, department, and GAL that termination proceedings be started.

In its written ruling, the juvenile court granted the mother an additional six months to work toward reunification, concluding:

> At this time, due to the ongoing concerns for [the mother's] mental health, substance use and overall stability, the children cannot be returned to her care right now. The concerns that were present at Adjudication still exist as of this date. The Court must then turn to the next question as to whether an extension of time is appropriate.
>
> It is extremely concerning to this Court that, even taken in the light most favorable to the Mother, the positive methamphetamine test just a month or so prior to the Permanency Hearing was explained by having been around people smoking meth. Whether ingested or around people doing it, those actions by the Mother do not show that she is understanding her actions regarding substances and the impact those decisions have on her children. The consistency in her mental health and substance abuse treatment is also concerning. However, the record on that is not extremely clear. [L.H.] also expressed her frustration with her Mother and believes she is better off in foster care.
>
> That being said, until a few months ago, the recommendation by the [the department] was that overnights begin with [the mother] and return of the children was imminent. This information is extremely compelling to this Court in favor of extending time. [The mother] has shown, in the past, that she is capable of parenting to the satisfaction of the [the department]. There were no reported concerns that she regularly misses visits. In sum, it appears [the mother] is currently giving her best effort. Although she needs to make improvements, with support and additional services, this Court believes she could make significant progress in the next 6 months.
>
> So there is no mistake, this Court expects that [the mother] will be given visitation as deemed appropriate by [the department] (if no visits occur and are the recommendation, this Court needs to be informed—a hearing is necessary on that issue). This should at least include supervised visitation to start. [The mother] shall be consistent with her substance abuse treatment and her mental health treatment. She shall sign releases for the DHHS for those providers so the [department] can get updates on her progress.
>
> If the [department] is not satisfied with testing via her substance abuse treatment provider, then random testing needs to

be done and authorized via the [department]. Coming back to this Court at the time of hearing and expressing distrust of drug testing protocols but not having requested independent testing fuels a "gotcha" mentality where parents cannot win.

[The mother] shall participate in parenting classes. The [department] will assist [the mother] in obtaining appropriate housing and necessary transportation. . . .

This is not to say that the children's concerns and their respective attorney's concerns about [the mother's] possibility of success aren't warranted. These children have been through a lot due to their Mother's actions. It will take time for her to gain their trust. Many times, actions speak louder than words—actions like the ones outlined above

L.H. appeals.

## II. Standard of Review.

"We review a permanency order de novo." *In re K.C.*, 660 N.W.2d 29, 32 (Iowa 2003). That means "[w]e review both the facts and the law and adjudicate rights anew." *Id.* "Although we give weight to the juvenile court's findings of fact, we are not bound by them." *Id.* And "[t]he best interests of the child are paramount to our decision." *Id.*

## III. Discussion.

The juvenile court may "give the parent an additional six months for reunification only if the need for removal 'will no longer exist at the end of the additional six-month period.'" *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (quoting Iowa Code § 232.104(2)(b)). It is up to the parent to show "the impediment to placing" the child with them "will not exist in six months." *Id.* And, to give the parent more time, we must also conclude the delay in permanency is in the child's best interests. *Id.* In making our best-interests determination, we rely on section 232.116(2). *See id.* It requires us to consider:

the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child. . . .

a. Whether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition . . . .

b. For a child who has been placed in foster family care . . . , whether the child has become integrated into the foster family to the extent that the child's familial identity is with the foster family, and whether the foster family is able and willing to permanently integrate the child into the foster family. In considering integration into a foster family, the court shall review the following:

(1) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining that environment and continuity for the child.

(2) The reasonable preference of the child, if the court determines that the child has sufficient capacity to express a reasonable preference.

Iowa Code § 232.116.

L.H. is an intelligent near-adult, and she clearly and thoughtfully explained the historic lack of safety and consistency in her life due to the mother's drug issues, mental-health problems, and general lack of stability.[5] L.H. opposes the delay in permanency and wishes for termination proceedings to be initiated. Her wishes are not controlling, but they "are relevant and cannot be ignored." *In re A.R.*, 932 N.W.2d 588, 592 (Iowa Ct. App. 2019) (citation omitted).

Here, even if we assume the mother would spend the additional six months free of illegal substances and consistently attending mental-health therapy, we cannot say delaying permanency is in L.H.'s best interests. L.H. had not seen or communicated with the mother in approximately three months at the time of the

---

[5] The record includes several mentions of the fact that this is not the mother's or family's first involvement with the department. Our record does not include any records from other cases, and we have no other information about prior instances of involvement.

permanency hearing. By April 2023, it was clear L.H. wanted to participate in family therapy, and the mother needed to complete an accountability letter to start the process. As of the late-October permanency hearing, the letter was still not done. At some point during that six-month window, L.H. moved on from her wish to engage in therapy with the mother. The mother's continued inability to accept—or at least to vocalize—the impact her actions have had on her children is noted throughout the reports to the court. Without a change in this stalemate, it is unclear how L.H. will begin to trust the mother or how their relationship would improve over the six-month extension. Moreover, without the ability to take accountability for her actions, we question the mother's actual progress. And, we cannot overlook that it is the mother's burden to show that in six months the impediment to reunification will no longer exist—a burden she cannot meet. Instead, it seemed like the juvenile court was willing to allow the mother to start again from scratch, setting up requirements that had been in place but not followed in the earlier months.

In contrast, L.H. feels supported and safe in the home of her foster family. She is thriving in school and is excited about getting to achieve typical teenage milestones. T.H. lives with the same foster family, so the sisters can continue their relationship. And L.H. and D.H. communicate often by phone. There is no evidence that L.H.'s relationship with her siblings would be harmed by initiating termination proceedings as to the mother's rights to only L.H.

Insofar as the mother suggests awarding her more time was necessary for the department to meet its reasonable-efforts mandate, we note that the record is devoid of any reasonable-efforts challenge. *See In re C.H.*, 652 N.W.2d 144, 148

(Iowa 2002) (requiring a parent to raise a complaint about reasonable efforts to the juvenile court directly "at the removal, when the case permanency plan is entered, or at later review hearings" to preserve the issue). And the juvenile court specifically found that the department made reasonable efforts and that the mother did not request any additional services. We do not consider this issue further.

Because delaying permanency is not in L.H.'s best interests, we reverse the juvenile court's grant of additional time to work toward reunification with L.H.; we remand with directions that termination proceedings be initiated as to the mother and L.H. We do not reverse the grant of additional time as to D.H. or T.H.; they are not at issue in this appeal.

**REVERSED AND REMANDED WITH DIRECTIONS.**